United States District Court
Southern District of Texas

**ENTERED**

July 17, 2024

Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER DALE HAVENS, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. 2:22-CV-00299 |
| | § | |
| BILL MILLS, *et al.*, | § | |
| | § | |
| Defendants. | § | |

<u>**MEMORANDUM AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**</u>

Plaintiff Christopher Dale Havens, appearing *pro se* and *in forma pauperis*, has filed this prisoner civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff claims that his constitutional rights were violated in various respects in connection with his confinement as a pretrial detainee. Plaintiff's case is subject to screening pursuant to the Prison Litigation Reform Act. *See* 42 U.S.C. § 1997e(c); 28 U.S.C. § 1915A.

The district court has already retained Plaintiff's Fourteenth Amendment claims for excessive force and denial of medical care against Sergeant Maddox, Sergeant Dugger, Officer Arisola, and Corporal Urhea in their individual capacities. Now, for purposes of screening and for the reasons discussed below, the undersigned recommends that the district court:

- RETAIN Plaintiff's Fourteenth Amendment deliberate indifference claim against Deputy Chief Chapa in his individual capacity for confiscating or denying Plaintiff's medical passes;

- RETAIN Plaintiff's Fourteenth Amendment due process claim against Sheriff Mills and Deputy Chief Chapa in their individual capacities regarding his placement into disciplinary segregation from August 23 to 26, 2022;

- RETAIN Plaintiff's Fourteenth Amendment due process claim against Deputy Chief Chapa, Lieutenant Martinez, Sergeant Tober, and Corporal Alvarado in their individual capacities regarding his August 26, 2022 disciplinary hearing;

- RETAIN Plaintiff's retaliation claim against Sheriff Mills in his individual capacity for temporarily transferring Plaintiff to a detention facility in Kleberg County in July 2023; and

- RETAIN Plaintiff's retaliation claim against Deputy Chief Chapa in his individual capacity for ordering that Plaintiff be placed into indefinite solitary confinement on or about June 21, 2023.

The district court should DISMISS with prejudice Plaintiff's remaining claims against all other defendants as frivolous or for failure to state a claim upon which relief can be granted, pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b)(1).

### A. Jurisdiction.

The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.  This case has been referred to the undersigned magistrate judge for case management and making recommendations on dispositive motions pursuant to 28 U.S.C. § 636.

### B. Background.

#### 1. Proceedings.

Plaintiff is confined as a pretrial detainee at the Aransas County Detention Center ("ACDC") in Rockport, Texas.  Plaintiff's allegations in this case arise in connection with his current confinement at ACDC.

After receiving a prior screening memorandum and recommendation (Doc. No. 23), the district court retained Plaintiff's Fourteenth Amendment excessive force claims against Sergeant

2 / 37

Maddox, Sergeant Dugger, Officer Arisola, and Corporal Urhea in their individual capacities.

(Doc. No. 35, p. 15.)  The district court also retained Plaintiff's Fourteenth Amendment episodic

claim regarding denial of medical care on August 23, 2022 against Sergeant Maddox, Sergeant

Dugger, Officer Arisola, and Corporal Urhea in their individual capacities.  *Id.* at 15-16.  The

district court dismissed virtually all of Plaintiff's other claims.  *See id.* at 15, 16-17.  After review

of Plaintiff's objections to the screening memorandum and recommendation, however, *see* Doc.

No. 32, the district court recommitted several specific claims to the undersigned for

reconsideration under any amended pleading.  Specifically, the district court recommitted

Plaintiff's claims for:

- Deliberate indifference against Deputy Chapa for denying Plaintiff's medical passes;

- Denial of due process against Deputy Chapa, Lieutenant Martinez, Sergeant Tober, Corporal Alvarado, Sergeant Maddox, Sergeant Dugger, Corporal Urhea, and Officer Arisola, with respect to the disciplinary hearing and administrative segregation; and

- Retaliation against Sheriff Mills, Deputy Chapa, Lieutenant Martinez, and Chief Gutierrez related to Plaintiff filing grievances or this action.

*Id.* at 16.

### 2. *Plaintiff files his second amended complaint.*

The district court ordered Plaintiff to "file an amended complaint limited to the claims

that have been retained or recommitted by this Order."  *Id.* at 17.  The district court also ordered

Plaintiff "to include his factual allegations against each Defendant for each remaining claim."

*Id.*  Plaintiff subsequently filed an amended complaint – this was his second amended complaint,

and it is his operative pleading.  (Doc. No. 44.)  Plaintiff has named ten defendants in his second

amended complaint: (1) Sheriff Bill Mills ("Sheriff Mills"); (2) Chief Deputy John Gutierrez

("Chief Gutierrez"); (3) Deputy Chief Armando Chapa ("Deputy Chief Chapa"); (4) Lieutenant

Hector Martinez ("Lieutenant Martinez"); (5) Sergeant Maddox; (6) Sergeant Dugger; (7)

Sergeant Tober; (8) Corporal Urhea; (9) Corporal Alvarado; and (10) Officer Arisola.  *Id.* at 3-4.

       After reviewing Plaintiff's second amended complaint, the undersigned ordered Plaintiff

to respond to a questionnaire, in order to better understand Plaintiff's allegations.  (Doc. No. 45.)

Plaintiff responded to the questionnaire.  (Doc. No. 46.)

       Plaintiff's second amended complaint is now his operative pleading.  It does not adopt or

incorporate his two prior complaints by reference, so it supersedes those prior complaints.  *See*

*Banks v. Valdez*, Civ. No. H-22-3367, 2023 WL 52216510, at *1 n.3 (Aug. 14, 2023) (Lake, J.)

(amended complaint supersedes the original complaint unless it specifically refers to and adopts

or incorporates it by reference).  Plaintiff's second amended complaint re-urges his claims of

excessive force and denial of medical care, which the district court has already retained after

screening.  *See* Doc. No. 44, pp. 6-8.  In addition, as invited by the district court, the amended

complaint raises claims of deliberate indifference for denying Plaintiff's medical passes (*id.* at 9-

10), denial of due process with respect to the August 23, 2022 disciplinary hearing and

administrative segregation (*id.* at 10-11), and retaliation (*id.* at 11-14).  The undersigned

concludes that Plaintiff has now pleaded his best case.

### 3. *Plaintiff's current factual allegations.*

       The information below is drawn from Plaintiff's second amended complaint (Doc. No.

44) and his response to the Court's questionnaire (Doc. No. 46).

#### a. *Excessive force.*

       Plaintiff alleges that several ACDC jail officials used excessive force against him on

August 23, 2022, in violation of his Fourteenth Amendment rights.  (Doc. No. 44, pp. 6-7.)  As

before, he alleges that Sergeant Maddox, Sergeant Dugger, Officer Arisola, and Corporal Urhea used excessive force.  *See id.*  The district court has already retained this claim.

### b. Denial of medical care.

Plaintiff alleges that he was denied medical care after the excessive force incident.  (Doc. No. 44, pp. 7-8.)  As before, he claims that Sergeant Maddox, Sergeant Dugger, Officer Arisola, and Corporal Urhea denied him medical care.  *See id.*  The district court has already retained this claim.

### c. Deliberate indifference: medical passes.

Plaintiff claims that Deputy Chief Chapa exhibited deliberate indifference to Plaintiff's medical needs when he confiscated or denied Plaintiff's medical passes.  (Doc. No. 44, pp. 9-10.) These "passes" had enabled Plaintiff to receive an extra sleeping mat for his bunk, as well as an extra blanket and assignment to a bottom bunk.  *See id.* at 9; Doc. No. 46, pp. 3 ¶¶ 10(a), 11(a); *id.* at 5 ¶ 18.  Plaintiff alleges that he was given "treatment plans" – that is, "a written acknowledgement of medical problems and steps to treat them" – by a Dr. Bingham at ACDC. (Doc. No. 46, p. 1 ¶¶ 7(a), (c).)

Plaintiff alleges that he has a variety of medical conditions, including, among others, a "torn knee, two torn shoulders," nerve damage from herniated and protruding discs at several locations, a bilateral hip condition, and limited movement in his neck because of spinal stenosis. (Doc. No. 46, p. 1 ¶ 7(b).)  He also claims to have epilepsy and that he is subject to seizures.  *Id.* at 2 ¶ 7(g).

A medical pass dated August 5, 2022, submitted by Plaintiff with his questionnaire response, directs an extra mat because of a history of "spinal trauma."  (Doc. No. 46-1, p. 4.) The name of the person who directed the issuance of that mat is illegible.  As reflected in a

progress note submitted by Plaintiff with his questionnaire response, Dr. Bingham examined Plaintiff on November 4, 2022, because Plaintiff was complaining of neck pain and numbness in his left arm.  (Doc. No. 46-1, p. 1.)  Dr. Bingham wrote a plan for Plaintiff, which included: "Give extra mat & blanket – disc disease." *Id.*; *see also* Doc. No. 46, p. 2 ¶ 7(f).  On that same day, a nurse named Pearson wrote Plaintiff an indefinite medical pass for "extra [mat] & extra blanket" because of "medical condition." *Id.* at 2.  On January 25, 2023, Nurse Pearson again wrote Plaintiff an indefinite medical pass for an extra mat and blanket because of his medical condition. *Id.* at 3.  The blanket, Plaintiff claims, was to "help stabilize my neck and prevent me from overextending it on one side that caused excruciating pain and loss of feeling down my arm when turned." (Doc. No. 46, p. 5 ¶ 18.)  Plaintiff also alleges that he was assigned a bottom bunk because of a medical pass for his epilepsy. *Id.* at 2 ¶ 7(g).

Plaintiff claims that Deputy Chief Chapa "confiscated" his medical passes on August 23, 2022.  (Doc. No. 44, p. 9; Doc. No. 46, p. 2 ¶ 9(b).)  As a result, the extra mat was taken away from Plaintiff, and Deputy Chief Chapa reassigned Plaintiff to a top bunk.  (Doc. No. 46, p. 3 ¶¶ 10(b), 11(c).)  Plaintiff was not given a reason by Deputy Chief Chapa for the confiscation. *Id.* ¶ 9(d).  He claims that he submitted a grievance and inquired at a subsequent disciplinary hearing. *Id.* ¶ 9(e).  "After a discussion between Chapa, Lt. Martinez, Sheriff Mills, and Chief Gutierrez, they determined I was playing the system." *Id.*.  Deputy Chief Chapa "believed I was gaming the system," Plaintiff alleges, "and had medical ensure I get … more definitive x-rays."  (Doc. No. 44, p. 9.)

Plaintiff subsequently underwent more x-rays, which he claims showed the straightening of his cervical spine, herniated and protruding discs, a curvature of the thoracic spine, among

other things.  (Doc. No. 46, p. 4 ¶ 17(a).)  Nevertheless, Deputy Chief Chapa still would not approve the medical passes for the bottom bunk or extra mat.  *Id.* ¶ 17(b).

Plaintiff claims that the extra mat protected him from serious harm by alleviating strain and pressure.  (Doc. No. 46, p. 4 ¶ 15.)  The mat "could prevent further [aggravation] of injuries or [permanent] injuries based on how the body heals properly or not causing other complications of varying degrees."  *Id.*  Removal of the mat, Plaintiff says, resulted in "continued pain, injury from compressed nerves, pinched nerves, loss of movement or feeling being very possibly [permanent]."  *Id.* ¶ 16.  Plaintiff claims that the harm was shown in "x-rays and MRI."  *Id.*

According to Plaintiff, having a bottom bunk, pursuant to the medical pass, protected him from serious harm because it "kept [him] from falling from the top in case of seizure.  Prevents further injury from compressing nerve roots or pinching nerves/[rupturing] spinal sac from herniated disc."  (Doc. No. 46, p. 4 ¶ 13; *see also id.* ¶ 14.)  Reassignment to a top bunk, Plaintiff alleges, placed him at risk of serious harm because he suffered from limited movement in his back and neck, and a fall from the top bunk could render him paralyzed.  *See id.* ¶ 14.

Plaintiff claims that Deputy Chief Chapa was subjectively aware of the substantial risk to Plaintiff's health and safety as a result of confiscating the extra mat and reassigning Plaintiff to a top bunk because Plaintiff "literally spoke with him in front of Nurse Heather about my injuries." (Doc. No. 46, p. 3 ¶ 12(b).)  Plaintiff alleges that Deputy Chief Chapa had multiple meetings with the doctor and Head Nurse Heather.  *Id.*  After Plaintiff received additional x-rays and MRIs, "the results were problematic because the head nurse didn't understand that [an] MRI shows everything including how recent … injuries occurred.  Chapa stated 'this is a problem for our defense' and threatened to fire Head Nurse Heather for not knowing how [an] MRI shows more detail than x-rays."  *Id.*

### d. *Denial of due process: disciplinary segregation without hearing.*

Plaintiff alleges that on August 23, 2022, he was "written up for a minor charge of insolence." (Doc. No. 44, p. 10.)[1]  Plaintiff was allegedly ordered into a segregation cell with his privileges revoked: he was not allowed shoes, reading material, or writing material, although he was later able to write a grievance. *Id.* Plaintiff's "hygiene was removed but later given." *Id.* Plaintiff states that he said: "This isn't legal.  I'm supposed to have a discipline hearing before punishment – it's required." (Doc. No. 46, p. 7 ¶ 20.)  He claims that he was not given a hearing before being placed in disciplinary segregation, and that he was disciplined without written notice, without being shown the evidence used against him, and without the opportunity to call witnesses. (Doc. No. 44, p. 10.)  Plaintiff alleges that he was arbitrarily being punished, "under the guise of insolence," "because it's the sheriff's jail and he makes the rules." (Doc. No. 46, p. 7 ¶ 21; *id.* at 8 ¶ 23.)

Plaintiff claims that he was ordered into disciplinary segregation without a hearing by Deputy Chief Chapa: "He is always the decision maker." (Doc. No. 46, p. 8 ¶ 33(a).)  He alleges that Sergeant Maddox, Sergeant Dugger, Corporal Urhea, and Officer Arisola were the people who actually placed him into the segregation cell. (Doc. No. 44, p. 10; Doc. No. 46, p. 9 ¶¶ 33(c) (Sergeant Maddox), 33(d) (Sergeant Dugger), 33(f) (Corporal Urhea), 33(h) (Officer Arisola).)

### e. *Denial of due process at disciplinary hearing.*

Plaintiff states that he was subsequently charged with a "major infraction of #18" – a disciplinary infraction for interrupting the safety and security of the facility. (Doc. No. 44, p. 10;

---

[1]  This is the same date on which Plaintiff was allegedly assaulted by the ACDC jail officials.

Doc. No. 46, p. 6 ¶ 19(a).)  Plaintiff claims that he was never given written notice of the charge –

he received only verbal notice, he says.  (Doc. No. 46, p. 6 ¶ 19(c).)

Plaintiff had a disciplinary hearing on August 26, 2022.  (Doc. No. 44, p. 10.)  He states

that his disciplinary hearing was attended by Deputy Chief Chapa, Lieutenant Martinez, Sergeant

Tober, and Corporal Alvarado.  *Id.*  Asked in the Court's questionnaire to list the people who

participated in the disciplinary hearing and to explain the specific role that each person played,

Plaintiff responded:

> Lieutenant Martinez as the moderator and does not decide by this is not true.  I
> could overhear deliberations with Chapa on the phone say "He's guilty."  Sergeant
> Tober, Corporal Alvarado, and Corporal Schiksnider are supposed to be fair and
> impartial decision makers.  They just try to put on a good show but have learned
> they need to be better now.

(Doc. No. 46, p. 7 ¶ 19(n).)

At the hearing, Plaintiff's accusers allegedly presented evidence in the form of guard

reports and video.  Plaintiff claims that he was "unable to read the reports or watch the video."

(Doc. No. 46, p. 6 ¶ 19(e).)  He also claims that he was not allowed to present witnesses at the

hearing.  *Id.* ¶ 19(f).  Plaintiff alleges that he specifically requested to call six different witnesses

at the hearing, and named those witnesses for Lieutenant Martinez.  *Id.* ¶ 19(j).  The witnesses,

Plaintiff says, "would have corroborated my claims and stated Aransas County is editing video

and using them for convictions."  *Id.* ¶ 19(h).  Lieutenant Martinez allegedly wrote down the

witnesses' names and "gave them to Sergeant Tober and told her to place them 'keep separate'

meaning I couldn't be placed in the cell with them ever again."  *Id.*  ¶ 19(j).

Plaintiff alleges that he also requested to present documents at the hearing, but "I only

had my notes of the facts of that day but it would clearly show how creative ACDC/Aransas

County is at warping facts and then contending with the [county's] policies of suppling [sic] and

using grossly edited videos." (Doc. No. 46, p. 6 ¶ 19(j).)  Asked whether he was given the opportunity to make a statement on his own behalf at the hearing, Plaintiff replied: "It was very limited and restrictive.  I was [interrupted] and rushed."  *Id.* ¶ 19(g).

Plaintiff claims that he was not given a reason for the denial of the opportunity to present witnesses or evidence.  (Doc. No. 46, p. 6 ¶ 19(k).)  Plaintiff states that he was found guilty at the hearing, and that he was sentenced to 30 days' solitary confinement, loss of all good time credit, and suspension of all inmate privileges.  *Id.* at 7 ¶¶ 19(l), 19(m).  Plaintiff's custodial classification was changed from the lowest to the highest level.  *Id.* ¶ 19(m).

Plaintiff alleges that he appealed the disciplinary ruling and the punishment he received. (Doc. No. 46, p. 8 ¶¶ 24, 26-28.)  He says that his appeal was ignored and that he never received a response.  *Id.* ¶ 25.  Plaintiff also claims that he filed a grievance about the hearing, but that the grievance was also ignored.  *Id.* ¶¶ 24, 29-32.

### f. Retaliation.

The district court recommitted to the undersigned Plaintiff's claim for retaliation against Sheriff Mills, Deputy Chapa, Lieutenant Martinez, and Chief Gutierrez related to Plaintiff's filing of grievances or this lawsuit.  (Doc. No. 35, p. 16.)  In his second amended complaint, Plaintiff alleges that he was retaliated against for filing grievances and this lawsuit.  (Doc. No. 44, pp. 11-19.)  The undersigned directed Plaintiff to complete a questionnaire, and to list each of the specific acts that Plaintiff believes constituted retaliation against him.  (Doc. No. 45, p. 8 ¶ 34(b).)  Plaintiff was also instructed to name the person or people who committed the allegedly retaliatory act, and to state his direct evidence that the person who committed the allegedly retaliatory act specifically intended the act as retaliation for filing a grievance or for filing this lawsuit.  *Id.* ¶¶ 34(b)(ii, iv).

In response, the retaliatory acts Plaintiff has alleged are: (1) being temporarily transferred to a detention center in Kleberg County; (2) indefinite solitary confinement; (3) permanent classification at the highest threat level, resulting in Plaintiff's having to wear a red uniform; (4) food tampering or poisoning with spit, feces, and semen; (5) changing of Plaintiff's bond amounts, or denial of bond altogether; and (liberally construed) (6) reading of legal mail and confiscation of legal paperwork. Those allegations are discussed next.

### i. *Temporary transfer to Kleberg County.*

Plaintiff claims that he was transferred to a detention center in Kleberg County for about 15 days beginning around July 16, 2023, in retaliation for filing grievances and this lawsuit. (Doc. No. 44, p. 11; Doc. No. 44, p. 10 ¶ 34(b)(iii); Doc. No. 46, p. 13 ¶ 35(c).) Plaintiff states that he had no pending cases in Kleberg County, and that he does not know where Kleberg County is. (Doc. No. 46, p. 13 ¶ 35(d).)

Plaintiff alleges that this retaliation was committed by Sheriff Mills, Chief Brooks, Deputy Chief Chapa, and Lieutenant Martinez. (Doc. No. 46, p. 10 ¶ 34(b)(ii).) He does not specify, however, how anyone other than Sheriff Mills engaged in this alleged retaliation. Asked for his evidence that the person who committed the act specifically intended it as retaliation for filing grievances or this lawsuit, Plaintiff states that he was approached by Sheriff Mills, who said "you have a stupid lawsuit you want my attention well now you have it." (Doc. No. 46, p. 10 ¶ 34(b)(iv).) Sheriff Mills allegedly continued, as Plaintiff recounts:

> Your not in danger you have more than most and your well taken care of but I'm the one that authorized your transfer and if you choose to continue filing grievances and lawsuits, I'll transfer you to other counties to teach you a lesson and then you'll know how good you really have it. I don't care because I already spoken to all the judges personally and the county is prepared to defend against your lawsuit. I don't

want anymore grievances and I don't and won't respond to you no matter how many times you write because the county has plenty money.

*Id.* (verbatim); *see also id.* p. 12 ¶ 35(a).

At Kleberg County, Plaintiff claims, he was placed in solitary confinement, drugged, passed out, and "woke up with a dildo in [his] anus." (Doc. No. 44, p. 19.)

### ii. Indefinite solitary confinement.

Plaintiff alleges that he was placed in indefinite solitary confinement starting around June 21, 2023. (Doc. No. 46, p. 10 ¶¶ 34(b)(i-iii).) He alleges that Sheriff Mills, Chief Brooks, Deputy Chief Chapa, and Lieutenant Martinez committed this act. *Id.* ¶ 34(b)(ii). Asked for his evidence that the person who committed the act specifically intended it as retaliation for filing grievances or this lawsuit, Plaintiff states, verbatim:

> Amando Chapa told me Im full of shit and have a propensity to fabricate truth and warp facts and he's in charge. Just because I have a lawsuit doesn't mean I'm protected in title 18,[2] that he can do this thing … its called … we don't give a fuck! because the County is prepared to defend and offer real evidence for your false accusations and blantant made up accusations. He knows people in the County.

*Id.* ¶ 34(b)(iv).

### iii. Threat level classification and uniform.

Plaintiff claims that Chief Deputy Gutierrez, Deputy Chief Chapa, and Lieutenant Martinez set his classification at the highest threat level around December 20, 2022, because he filed this lawsuit. (Doc. No. 46, p. 10 ¶¶ 34(b)(i-iii).) Asked for his evidence that the person who committed the act specifically intended it as retaliation for filing grievances or this lawsuit,

---

[2] Although he mentions the statute in his complaint and questionnaire response (*e.g.*, *id.* and Doc. No. 44, p. 18), Plaintiff does not purport to raise a § 1983 claim based on any alleged violation of 18 U.S.C. § 1512. Even if he had, such a claim would be subject to dismissal because Plaintiff has no standing to sue for alleged violations of criminal law. *See Hanna v. Home Ins. Co.*, 281 F.2d 298, 303 (5th Cir. 1960).

Plaintiff states that he attended an "improper discipline hearing where my charges were dismissed but Chapa stated I was classified this level because I attacked two of his guards August 23, 2022 and they had to administer chemical mace because I forced them in self defense. Also this is my jail and we decide whats appropriate." *Id.* ¶ 34(b)(iv).  He continues:

> As other inmates are being shackled for court Chief Guttierrez tells Sgt Cooper he wants to see me in red at court everytime.  At the same time Chapa is speaking to Martinez and states he thinks he can sues us and expect nothing to happen.  Lets pay attention to his mail.  This is now a problem because they are reading my legal mail and gaining advantage.

*Id.*

### iv. *Food tampering and poisoning.*

Plaintiff alleges that jail officials are tampering with or poisoning his food with "spit, feces, and [semen].  Also excessive salt and Raid."  (Doc. No. 46, p. 11 ¶ 34(b)(i).)  This treatment allegedly began in April 2023 and is continuing.  *Id.* ¶ 34(b)(iii).  He claims:

> I was told my food had spit at first and later it was confirmed human fecal matter (feces) and feet fungus.  I started to pay attention and ultimately stopped eatting the food altogether because a whole shift poisoned my food with seamen and the guard supposedly had Hepititus-C.  I heard the guards talking and laughing about it trying to figure out if I ate my food this comes after my dermintology visit in which deputy Chapa assures me that my food is not being tampered with and proven he was wrong.

(Doc. No. 44, p. 17) (verbatim).  Plaintiff also alleges that his food was "served ice cold and food portions becoming smaller or food groups similar" after filing grievances.  (Doc. No. 44, p. 15.)

Plaintiff alleges that the people responsible for this treatment are "Sgt Lopez, Cpl Fincher, Rosemond, Pena, Barcus, Zarate, Alvarado (an entire shift), Cpl Vanmetter, Cpl Nguyen, Solis, Copeland, Arndt, Eisemann, Sgt Cooper (entire shift), Browning, Lt Martinez, Sgt Andrade, and Amando Chapa" and that these people were assisted by unnamed trustees (Doc. No. 46, p.11 ¶ 34(b)(ii); *id.* at 13 ¶ 36(b).)  Asked for his evidence that the person who

committed the act specifically intended it as retaliation for filing grievances or this lawsuit,

Plaintiff states, verbatim:

> This one is complicated but I have written down multipul overheard conversations
> of guards talking amongst themselves and with Chapa or Lt Martinez.  Chapa knew
> this was happening and personally told people that he was going to ignore my
> grievances for them not to worry about anything.  Hes been talking to the sheriff,
> Chief Guttierrez and the new chief that is replacing Gutterez (Micheal brooks), and
> Judge Diane Dupnik while the sheriff talks to the local district judges Whateley,
> Gaughor, and Flannigan.

*Id.* at ¶ 34(b)(iv).

### v.  Changing bond amounts, or denying bond.

Plaintiff alleges that, around February 2023, his bonds were changed by Deputy Chief

Chapa, Lieutenant Martinez, Sergeant Cooper, and Sergeant Andrade.  (Doc. No. 46, p. 11 ¶¶

34(b)(i-iii).  Liberally construed, although his allegation is not particularly clear, Plaintiff

appears to be claiming that jail officials are changing his bond amounts "without having to take

[him] to court."  *Id.* at 11-12 ¶ 34(b)(iv).  He claims that "they are intercepting and not sending

my legal mail.  If my mail is it's being ignored by the judges for administrative error.  Chapa,

Chief, and the sheriff have the judges on board."  *Id.* at 12 ¶ 34(b)(iv).

### vi.  Interception or viewing of legal mail.

Liberally construed, Plaintiff claims that, on an unspecified date, unnamed jail guards

entered his cell and "illegally physically confiscated three title 42 that I was actively working on

then proceed to read all my legal mail and paperwork relating to this suit to confiscate physical

papers of me detailing my daily events, interactions, and handwritten copies of grievances

submitted as well as all request forms."  (Doc. No. 46, p. 9 ¶ 34.)

### 4. *Plaintiff's legal claims.*

Liberally construed, Plaintiff's legal claims for purposes of screening are these:

- Fourteenth Amendment excessive force claim against Sergeant Maddox, Sergeant Dugger, Corporal Urhea, and Officer Arisola in their individual capacities;

- Fourteenth Amendment episodic claim for denial of medical care on August 23, 2022 against Sergeant Maddox, Sergeant Dugger, Corporal Urhea, and Officer Arisola in their individual capacities;

- Fourteenth Amendment deliberate indifference claim against Deputy Chief Chapa in his individual capacity for confiscation or denial of medical passes;

- Fourteenth Amendment due process claim against Deputy Chief Chapa, Sergeant Maddox, Sergeant Dugger, Corporal Urhea, and Officer Arisola in their individual capacities for placing him into administrative segregation on August 23, 2022;

- Fourteenth Amendment due process claim against Deputy Chief Chapa, Lieutenant Martinez, Sergeant Tober, Corporal Alvarado, and Corporal Schiksnider in their individual capacities for violating Plaintiff's due process rights at the disciplinary hearing on August 26, 2022; and

- Individual capacity retaliation claims against Sheriff Mills, Chief Deputy Gutierrez, Deputy Chief Chapa, Lieutenant Martinez, and Corporal Alvarado.

### C. *Legal standard.*

When a prisoner seeks to proceed *in forma pauperis* the Court shall evaluate the complaint and dismiss it without service of process if the Court finds the complaint frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief.  28 U.S.C. § 1915A; *see also* 28 U.S.C. §

1915(e)(2)(B) (providing that a court shall review an *in forma pauperis* complaint as soon as practicable and dismiss it if it is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from an immune defendant). A claim is frivolous if it has no arguable basis in law or fact. *Neitzke v. Williams,* 490 U.S. 319 (1989). A claim has no arguable basis in law if it is based on an indisputably meritless legal theory, "such as if the complaint alleges the violation of a legal interest which clearly does not exist." *Davis v. Scott,* 157 F.3d 1003, 1005 (5th Cir. 1998). A claim has no arguable basis in fact if "after providing the plaintiff the opportunity to present additional facts when necessary, the facts alleged are clearly baseless." *Talib v. Gilley,* 138 F.3d 211, 213 (5th Cir. 1998).

"In analyzing the complaint, [the Court] will accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Jones v. Greninger,* 188 F.3d 322, 324 (5th Cir. 1999). "The issue is not whether the plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support his claim." *Id.* Therefore, the Court "should not dismiss the claim unless the plaintiff would not be entitled to relief under any set of facts or any possible theory that he could prove consistent with the allegations in the complaint." *Id.* (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiff must allege sufficient facts in support of his legal conclusions that give rise to a reasonable inference that the defendants are liable. *Id.*; *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). The factual allegations must raise Plaintiff's claim for relief above the level of mere speculation. *Twombly*, 550 U.S. at 555. As long as the complaint, taken as a whole, gives rise to a plausible inference of actionable conduct, Plaintiff's claim should not be dismissed. *Id.*

16 / 37

Pleadings filed by *pro se* litigants like Plaintiff are construed using a less stringent standard of review. Documents filed by *pro se* litigants are to be liberally construed, and *pro se* complaints, however inartfully drafted they might be, are held to less stringent standards than formal pleadings drafted by lawyers. *See Oliver v. Scott*, 276 F.3d 736, 740 (5th Cir. 2002) (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972)); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A plaintiff's well-pleaded factual allegations in the complaint are to be taken as true for purposes of screening, but such deference does not extend to conclusory allegations, unwarranted factual inferences, or legal conclusions. *DeMarco v. Davis*, 914 F.3d 383, 386-87 (5th Cir. 2019).

Section 1983 provides a vehicle for redressing the violation of federal law by those acting under color of state law. *Nelson v. Campbell*, 541 U.S. 637, 643 (2004); *Albright v. Oliver*, 510 U.S. 266, 271 (1994). To prevail on a § 1983 claim, the plaintiff must prove that a person acting under the color of state law deprived him of a right secured by the Constitution or laws of the United States. 42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48 (1988). A defendant acts under color of state law if he or she misuses or abuses official power and if there is a nexus between the victim, the improper conduct, and the defendant's performance of official duties. *Townsend v. Moya,* 291 F.3d 859, 861 (5th Cir. 2002).

### D. Discussion.

#### 1. The district court has already retained Plaintiff's Fourteenth Amendment claims for excessive force and denial of medical care against Sergeant Maddox, Sergeant Dugger, Officer Arisola, and Corporal Urhea in their individual capacities.

The district court has already retained Plaintiff claims for use of excessive force and for the episodic alleged denial of medical care on August 23, 2022 against Sergeant Maddox,

Sergeant Dugger, Officer Arisola, and Corporal Urhea in their individual capacities.  (Doc. No. 35, pp. 15-16.)  Plaintiff's second amended complaint realleges those claims.  (Doc. No. 44, pp. 6-7.)  The undersigned will order service of process on the named defendants on those claims.

### 2. The district court should retain Plaintiff's Fourteenth Amendment deliberate indifference claim against Deputy Chief Chapa for confiscating or denying Plaintiff's medical passes.

"The constitutional rights of a pretrial detainee are found in the procedural and substantive due process guarantees of the Fourteenth Amendment."  *Estate of Henson v. Wichita Cnty.*, 795 F.3d 456, 462 (5th Cir. 2015).  "The Fourteenth Amendment requires that state officials not disregard the 'basic human needs of pretrial detainees, including medical care.'" *Estate of Henson v. Krajca*, 440 F. App'x 341, 343 (5th Cir. 2011) (quoting *Hare v. City of Corinth*, 74 F.3d 633, 650 (5th Cir. 1996) (*en banc*)); *see also Wichita Cnty., 795 F.3d at 462* (quoting this language from *Krajca*).  "[T]he substantive limits on state action set by the Due Process Clause provide that the state cannot punish a pretrial detainee."  *Wichita Cnty.*, 795 F.3d at 462.

The Fourteenth Amendment prohibits deliberate indifference to a pretrial detainee's medical needs.  *See Ford v. Anderson Cnty., Tex.*, 90 F.4th 736, 752 n.5 (5th Cir. 2024).  A constitutional violation exists where an officer subjectively knows of a substantial risk of serious harm to the detainee and responds to that risk with deliberate indifference.  *Id.* (citing *Cope v. Cogdill*, 3 F.4th 198, 206-07 (5th Cir. 2021)).  To prove the subjective prong of the deliberate indifference test, the inmate must establish that the prison official "had subjective knowledge that the inmate faced a substantial risk of harm [to the inmate's health and safety] and … [consciously] disregarded the risk."  *Valentine v. Collier*, 993 F.3d 270, 281 (5th Cir. 2021); *see also Lawson v. Dallas Cnty*, 286 F.3d 257, 262 (5th Cir. 2002).  In other words, "[an] official

violates a pretrial detainee's constitutional rights to be secure in his basic human needs only when the official had subjective knowledge of a substantial risk of serious harm to the detained and responded to that risk with deliberate indifference." *Cope v. Cogdill*, 3 F.4th 198, 206-07 (5th Cir. 2021) (internal quotations and citation omitted).

Deliberate indifference is an extremely high standard to meet. *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001). The Fifth Circuit has "consistently recognized … that 'deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm.'" *Dyer v. Houston*, 964 F.3d 374, 381 (5th Cir. 2020) (quoting *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 458-59 (5th Cir. 2001)); *see also Aguirre v. City of San Antonio*, 995 F.3d 395, 420 (5th Cir. 2021) ("Negligence or even gross negligence is not enough, the officials must have actual knowledge of the substantial risk."). The Supreme Court further explains that "an official's failure to alleviate a significant risk that he should have perceived but did not" falls short of constituting deliberate indifference. *Farmer*, 511 U.S. at 838.

"A detainee can establish a jail official's deliberate indifference by showing that the official refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Ford*, 90 F.4th at 752 (cleaned up). Deliberate indifference can also be shown where a jail official knows that a detainee faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 827 (1994)).

In this case, Plaintiff alleges deliberate indifference on the part of Deputy Chief Chapa for confiscating or denying Plaintiff's medical passes, which would have afforded Plaintiff an

extra sleeping mat and assignment to a bottom bunk.  (Doc. No. 44, pp. 9-10; Doc. No. 46, pp. 1-5 ¶¶ 7-18.)

Plaintiff plausibly alleges that he suffers from multiple medical conditions including epilepsy, chronic pain and injuries to his knee, shoulders, and back.  *See* Doc. No. 44, p. 9; Doc. No. 46, p. 1 ¶ 7(b).  He also plausibly alleges that in connection with treatment plans ordered by a visiting doctor in the ACDC medical department, Plaintiff was given "passes" for an extra sleeping mat and for assignment to a bottom bunk.  (Doc. No. 44, p. 9; Doc. No. 46, pp. 1-2 ¶¶ 7-8; *id.* at 3 ¶¶ 10-11.)  Asked from what serious harm the sleeping mat would protect him, Plaintiff responded that the mat "could prevent further aggervation of injuries or permanate injuries based on how the body heals properly or not causing other complications of varying degrees."  (Doc. No. 46, p. 4 ¶ 15, verbatim.)  The bottom bunk pass, Plaintiff asserts, was intended to keep him from falling from the top bunk in case of a seizure and to prevent further injury from "compressing nerve rotos or pinching nerves / [rupturing] spinal sac from herniated disc."  *Id.* ¶ 13.

Plaintiff alleges that Deputy Chief Chapa was subjectively aware of the risk to Plaintiff's health because "he's had [multiple] meetings with the doctor, head nurse Heather, Sheriff Mills, Chief Guttierrez."  (Doc. No. 46, p. 3 ¶ 12(b).)  Plaintiff also claims that Deputy Chief Chapa "was given notice" of Plaintiff's medical passes and was given access to Plaintiff's medical records and the need for the extra mat and the bottom bunk.  (Doc. No. 44, p. 9.)  Plaintiff alleges that Deputy Chief Chapa was also given a copy of his treatment plans.  (Doc. No. 46, p. 2 ¶ 7(h).)

Deputy Chief Chapa also ordered more definitive x-rays, which Plaintiff claims showed, as he puts it, "the straightening of my cervical spine signific at C1-C2.  Herniated and

protruding C5-C6, my thoracic spine shown to have a curvature, herniation of L4-L-5 sever with pars interacticularis defect at L5 on both left and right side." (Doc. No. 35, p. 4 ¶ 17(a).)

Nevertheless, Plaintiff alleges, on August 23, 2022, Deputy Chief Chapa ordered the removal of Plaintiff's passes for the extra sleeping mat and the bottom bunk assignment. (Doc. No. 46, p. 2 ¶ 9(b).) Plaintiff claims that Sergeant Andrade, Sergeant Lopez and Guard Doane told him that Deputy Chief Chapa ordered Plaintiff's move to a top bunk because Plaintiff was "too comfortable in [his] cell." *Id.* at 3 ¶¶ 10(b), 10(d). Plaintiff alleges that Deputy Chief Chapa ordered the removal of the extra mat because after watching videos, he and Sheriff Mills believed that Plaintiff was "playing the system." *Id.* ¶ 11(d).

Plaintiff's allegations, liberally construed and accepted as true for purposes of screening, indicate that the removal of Plaintiff's passes for an extra mat and bottom bunk restriction exposed him to a substantial risk of serious harm. This is especially so given his allegations that a medical provider authorized these passes to alleviate pain and the risk of further injury associated with Plaintiff's allegedly serious physical issues. Having been afforded the opportunity to amend his complaint, Plaintiff now also plausibly alleges that Deputy Chief Chapa had subjective knowledge that Plaintiff faced a substantial risk of harm and that he consciously disregarded that risk by ordering the removal of Plaintiff's passes. *Cf. Valentine*, 993 F.3d at 281. Accordingly, the undersigned recommends that Plaintiff's deliberate indifference claim against Deputy Chapa in his individual capacity, based on his alleged denial or order for the removal of Plaintiff's extra sleeping mat and bottom bunk passes, be RETAINED. The undersigned will order service of process on that claim.

### 3.  The district court should retain Plaintiff's Fourteenth Amendment due process claim against Sheriff Mills and Deputy Chief Chapa regarding Plaintiff's placement into disciplinary segregation from August 23 to 26, 2022.

Liberally construed, Plaintiff claims that on August 23, 2022, he was moved into a segregation cell, with his privileges revoked, for a "minor charge of insolence." (Doc. No. 44, p. 10.)  Plaintiff claims that this August 23 placement into disciplinary segregation was ordered by Sheriff Mills and Deputy Chief Chapa, and that he was physically placed into that segregation by Sergeant Maddox, Sergeant Dugger, Corporal Urhea, and Officer Arisola.  (Doc. No. 44, p. 10; Doc. No. 46, p. 7 ¶ 20.)  He alleges that he was "found guilty without a hearing, a written notice, evidence used against me." (Doc. No. 44, p. 10.)  After three days, Plaintiff was convicted on August 26 at a disciplinary hearing of "a major infraction of #18" – interrupting the safety and security of the facility.  *Id.*; Doc. No. 46, p. 6 ¶ 19(a).  The undersigned construes Plaintiff's claim as one for deprivation of due process rights relating to the three days he spent in disciplinary segregation from August 23 to August 26, and recommends that the district court RETAIN that claim, although with respect to only some of the defendants named by Plaintiff.[3]

The Fourteenth Amendment's Due Process Clause prohibits the "punishment" of a pretrial detainee prior to an adjudication of guilt.  *Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979).. "A person lawfully committed to pretrial detention has not been adjudicated guilty of any crime."  *Id.* at 536.  Pretrial detainees may nevertheless be subjected to "the restriction and conditions of the detention facility so long as those conditions and restriction do not amount to punishment, or otherwise violate the Constitution."  *Id.* at 536-37.

Pretrial detainees are not immune from prison disciplinary actions.  *See Scott v. Lemdke*, No. A-18-CA-610-LY, 2018 WL 4664138, at *2 (W.D. Tex. Sept. 28, 2018) (citing *Rapier v.*

---

[3]  The August 26 disciplinary hearing is addressed separately, below.

*Harris*, 172 F.3d 999, 1002 (7th Cir. 1999)).  Other circuits have found that prison officials can impose reasonable punishment to enforce reasonable disciplinary requirements so long as the punishment is not for prior unproven conduct.  *E.g.*, *Collazo-Leon v. United States Bureau of Prisons*, 51 F.3d 315, 318 (1st Cir. 1995).  "As unconvicted citizens, pretrial detainees deserve at least the protections of convicted inmates at a disciplinary hearing."  *Frank v. Larpenter*, 234 F.3d 706 (Table), 2000 1598076, at *2 (5th Cir. Oct. 3, 2000) (citing *Rapier*, 172 F.3d at 1004; *Mitchell v. Dupnik*, 75 F.3d 517, 525 (9th Cir. 1996)).

With regard to convicted prisoners, the Constitution requires no particular disciplinary process unless something more than a mere change in condition of confinement occurs.  *See Sandin v. Conner*, 515 U.S. 472, 484 (1995).  "The Due Process Clause does not protect every change in conditions of confinement which has a substantial adverse effect upon a prisoner."  *Madison v. Parker*, 104 F.3d 765, 767 (5th Cir. 1997).  Where discipline does not inevitably affect the duration of a prisoner's incarceration or sentence, the prisoner is not constitutionally required to be afforded the full panoply of procedural protections described in *Wolff v. McDonnell*, 418 U.S. 539 (1974).  *See Sandin*, 515 U.S. at 481-83.  A "temporary placement in a restricted cell or loss of other privileges as punishment for disciplinary violations are 'merely changes in the conditions of [a prisoner's] confinement and do not implicate due process concerns."  *Pierce v. Porter*, Civ. No. 21-1262, 2022 WL 2298455, at *20 (E.D. La. June 6, 2022) (quoting *Madison*, 104 F.3d at 768).

In this case, however, Plaintiff is a pretrial detainee, not a convicted prisoner.  Although the Fifth Circuit does not appear to have expressly considered the issue in a published opinion, it has applied *Sandin* to pretrial detainees in some unpublished opinions.  *E.g.*, *Aucoin v. Terrebonne Par. Sheriff's Off.*, No. 21-30322, 2022 WL 16657429, at *2 (5th Cir. Nov. 3, 2022)

(pretrial detainee's claims about disciplinary proceeding were properly dismissed because detainee failed to allege atypical or significant hardship); *Bonner v. Alford*, 594 F. App'x 266, 267 (5th Cir. 2015) (applying *Pichardo v. Kinker*, 73 F.3d 612 (5th Cir. 1996), a case which relied on *Sandin*, to pretrial detainee); *Rhine v. City of Mansfield*, 499 F. App'x 334, 335 (5th Cir. 2012) (quoting *Sandin*, 515 U.S. at 484, and holding that liberty interest in avoiding restrictive conditions of confinement exists only if the conditions "impose[] atypical conditions and significant hardship[s] on the inmate in relation to the ordinary incidents of prison life."). Other circuits that have considered the issue, however, have determined that *Sandin* does not apply in cases involving pretrial detainees. *See Welsh v. Lubbock Cnty.*, 70 F.4th 869, 871 (Mem) (5th Cir. 2023) (Elrod, J., concurring) (collecting cases). It is at least arguable, then, that Plaintiff, as a pretrial detainee, was required to be afforded *Wolff* protections prior to being placed in disciplinary segregation for a violation of the jail's rules or policies. Those protections generally include advance notice of the claimed violation, a written statement of the factfinders as to the evidence relied upon and a reason for the disciplinary action taken, and an opportunity to call witnesses and present documentary evidence. *See Banuelos v. McFarland*, 41 F.3d 232, 234 (5th Cir. 1995).

Here, Plaintiff alleges that, as a pretrial detainee, he was punished because he was placed into disciplinary segregation for three days (August 23 to August 26) without being afforded the protections contemplated by *Wolff*. This, Plaintiff alleges, violated his Fourteenth Amendment due process rights. The district court should RETAIN this claim, but only against Sheriff Mills and Deputy Chief Chapa, whom Plaintiff alleges ordered that he be placed into disciplinary

segregation.  The undersigned will order service of process on Sheriff Mills and Deputy Chief Chapa.[4]

Plaintiff's claims against Sergeant Maddox, Sergeant Dugger, Corporal Urhea, and Officer Arisola, even liberally construed, allege not that those defendants violated Plaintiff's due process rights but only that they physically placed Plaintiff into disciplinary segregation upon being ordered to do so by Sheriff Mills or Deputy Chief Chapa.  The district court should therefore DISMISS as frivolous Plaintiff's due process claim against Sergeant Maddox, Sergeant Dugger, Corporal Urhea, and Officer Arisola.

### 4. The district court should retain Plaintiff's Fourteenth Amendment due process claims against Deputy Chief Chapa, Lieutenant Martinez, Sergeant Tober, and Corporal Alvarado regarding Plaintiff's August 26, 2022 disciplinary hearing.

Plaintiff claims that he was "written up for a major infraction of #18" – interrupting the safety and security of the facility.  (Doc. No. 44, p. 10; Doc. No. 46, p. 6 ¶ 19(a).)  Plaintiff had a disciplinary hearing on August 26.  Plaintiff contends that ACDC officials violated his Fourteenth Amendment due process rights with respect to that hearing.

Plaintiff claims that he was sentenced to 30 days' solitary confinement, loss of all good-time credit, and loss of all inmate privileges.  His custodial status was changed from the lowest to the highest category.  (Doc. No. 44, pp. 10-11; Doc. No. 46, p. 7 ¶ 19(m).)  The undersigned concludes that Plaintiff was arguably entitled to *Wolff* due process protections for his August 26 disciplinary hearing, because Plaintiff was allegedly punished as a pretrial detainee with solitary confinement and also loss of good-time credit.  *See Welsh*, 70 F.4th at 871 (Elrod, J.,

---

[4]  The undersigned's recommendation to retain this due process claim is based on the undersigned's conclusion that *Sandin* arguably does not apply to pretrial detainees.  Once served, the defendants are certainly free to seek dismissal on the basis that the undersigned is mistaken in this view.

concurring); *see also Madison*, 104 F.3d at 768-79 (forfeiture of good-time credit, where a right to such credit is created by the state, can trigger due process rights).

Plaintiff alleges that his due process rights were not observed.  He claims that he was given only verbal notice of the charges.  (Doc. No. 46, p. 6 ¶ 19(c).)  He claims that he was not allowed to present witnesses or documentary evidence in his defense, and that he was not given a reason for this denial.  *Id.* ¶¶ 19(f), 19(i), 19(k).  Indeed, he alleges that Lieutenant Martinez asked him to list the witnesses he wished to call, but when provided the list instead directed Sergeant Tober to keep all of those people separated from Plaintiff in the future.  *Id.* ¶ 19(j).  Plaintiff further claims that he was "unable" to read the reports or watch the video that was presented at the hearing.  *Id.* ¶ 19(c).  Plaintiff alleges that he attempted to appeal the decision, but that his appeal was ignored; he also claimed that he filed at least one grievance protesting the disciplinary proceeding but did not receive a response.  *See* Doc. No. 44, p. 11; Doc. No. 46, p. 6 ¶ 19(k); *id.* at 8 ¶¶ 24-32.

Plaintiff plausibly alleges that he was denied written notice of the charges and the opportunity to call witnesses or present documents in his defense.  He alleges that Deputy Chief Chapa, Lieutenant Martinez, Sergeant Tober, and Corporal Alvarado were in attendance at the hearing.  (Doc. No. 44, p. 10.)  Plaintiff alleges that all of these individuals deprived him of his due process rights: Deputy Chief Chapa allegedly ignored Plaintiff's disciplinary hearing rights and his appeal; Lieutenant Martinez allegedly denied Plaintiff's request to present witnesses; Sergeant Tober and Corporal Alvarado allegedly ignored Plaintiff's disciplinary hearing rights. (Doc. No. 46, pp. 8-9 ¶¶ 33(a), 33(b), 33(e), 33(g).)  The undersigned recommends that

Plaintiff's due process claim should be RETAINED.[5]  The undersigned will order service of process on these defendants.[6]

Plaintiff also names Sergeant Maddox, Sergeant Dugger, Corporal Urhea, and Officer Arisola among those defendants who allegedly violated his due process rights.  *See* Doc. No. 46, p. 9 ¶¶ 33(c), 33(d), 33(f), 33(h).  To the extent that Plaintiff seeks to hold these defendants accountable for due process failures at the August 26 hearing, he fails to plausibly allege any facts indicating that any of these people failed to observe his due process rights (or that they were even present at all).  The district court should therefore DISMISS as frivolous Plaintiff's due process claim against those defendants.

### 5.  *The district court should retain some, but not all, of Plaintiff's retaliation claims.*

Plaintiff has alleged retaliation by various defendants for: (1) being temporarily transferred to a detention center in Kleberg County; (2) indefinite solitary confinement; (3) permanent classification at the highest threat level, resulting in Plaintiff's having to wear a red uniform; (4) food tampering or poisoning with spit, feces, and semen; (5) changing of Plaintiff's bond amounts, or denial of bond altogether; and (liberally construed) (6) reading of legal mail and confiscation of legal paperwork.  The undersigned recommends that the district court retain some, but not all, of Plaintiff's retaliation claims.

---

[5]  Plaintiff does not request the overturning of the August 26 disciplinary conviction or the restoration of the allegedly forfeited good-time credits.  Rather, he asks only for monetary damages, "policy changes, proper training," "proper medical treatment," and recovery of costs.  Therefore, the undersigned concludes that Plaintiff's due process claim is not barred by *Heck v. Humphrey*, 512 U.S. 477, 483 (1994), because Plaintiff's claim does not "'call into question the lawfulness of the plaintiff's continuing confinement.'"  *See Adams v. Harris Cnty. Jail*, Civ. No. H-23-3940, 2024 WL 1144257, at *5 (S.D. Tex. Mar. 15, 2024) (Rosenthal, J.) (quoting *Mahogony v. Stalder*, 242 F. App'x 261, 263 (5th Cir. 2007) (per curiam)).

[6]  Plaintiff alleges that a Corporal Schiksnider was present at the disciplinary hearing as well, *see* Doc. No. 46, p. 7, ¶ 19(n), but does not name that person as a defendant.

"Retaliation" is not expressly referred to in the Constitution; however, it is nonetheless actionable because retaliatory actions may tend to chill an individual's exercise of constitutional rights. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Retaliation is actionable "only if the retaliatory act 'is capable of deterring a person of ordinary firmness from further exercising his constitutional rights.'" *Bibbs v. Early*, 541 F.3d 267, 270 (5th Cir. 2008) (quoting *Morris v. Powell*, 449 F.3d 682, 684 (5th Cir. 2006)).

"A prison official may not retaliate against or harass an inmate for exercising the right of access to the courts, or for complaining to a supervisor about a guard's misconduct." *Woods v. Smith*, 60 F.3d 1161, 1164 (5th Cir. 1995). "Filing grievances and otherwise complaining about the conduct of correctional officers through proper channels are constitutionally protected activities, and prison officials may not retaliate against inmates for engaging in such protected inmates." *Reese v. Skinner*, 322 F. App'x 381, 383 (5th Cir. 2009) (citing *Morris*, 449 F.3d at 684).

The Fifth Circuit has emphasized that "prisoners' claims of retaliation are regarded with skepticism and are carefully scrutinized by the courts." *Adeleke v. Fleckenstein*, 385 F. App'x 386, 387 (5th Cir. 2010) (citing *Woods*, 60 F.3d at 1166). In addition, the Fifth Circuit has concluded that some acts, even though they may be motivated by retaliatory intent, are so *de minimis* that they would not deter the ordinary person from further exercise of his rights. *Morris*, 449 F.3d at 686. Such acts do not rise to the level of constitutional violations and cannot form the basis of a § 1983 claim. *Id.*

To state a valid § 1983 claim for retaliation, "a prisoner must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation." *Jones*, 188 F.3d at 324-25

(citing *McDonald v. Stewart*, 132 F.3d 225, 231 (5th Cir. 1998)).  Mere assertions of an inmate's personal belief that he is the victim of retaliation or conclusory allegations do not create a valid claim for relief.  *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997); *Woods*, 60 F.3d at 1166.  The inmate must produce direct evidence of motivation or a chronology of events from which retaliation may be inferred.  *Id.*  On the element of causation, a successful claim of retaliation requires a showing that, but for some retaliatory motive, the complained of adverse incident would not have occurred.  *Id.*

### i. Temporary transfer to Kleberg County.

The district court should RETAIN Plaintiff's claim that he was transferred to a detention center in Kleberg County for about 15 days beginning around July 16, 2023, in retaliation for filing this grievances and this lawsuit.  (Doc. No. 44, p. 11; Doc. No. 44, p. 10 ¶ 34(b)(iii); Doc. No. 46, p. 13 ¶ 35(c).)  Plaintiff claims that he had no pending cases in Kleberg County, and that he does not know where Kleberg County is.  (Doc. No. 46, p. 13 ¶ 35(d).)

Liberally construed, Plaintiff's claim plausibly alleges conduct only by Sheriff Mills himself.  The decision to transfer Plaintiff was allegedly made by the sheriff alone, who allegedly told Plaintiff of his retaliatory intent in ordering the transfer:

> You have a stupid lawsuit you want my attention well now you have it.  Your not in danger you have more than most and your well taken care of but I'm the one that authorized your transfer and if you choose to continue filing grievances and lawsuits, I'll transfer you to other counties to teach you a lesson and then you'll know how good you really have it.  I don't care because I already spoken to all the judges personally and the county is prepared to defend against your lawsuit.  I don't want anymore grievances and I don't and won't respond to you no matter how many times you write because the county has plenty money.

(Doc. No. 46, p. 10 ¶ 34(b)(iv); *see also id.* p. 12 ¶ 35(a).

Plaintiff therefore plausibly alleges that he filed grievances and this lawsuit, that Sheriff Mills intended to retaliate against Plaintiff for filing the suit,[7] that Sheriff Mills ordered Plaintiff's temporary transfer to Kleberg County; and that the transfer would not have occurred were it not for Plaintiff's filing of this suit.  It is not immediately apparent whether transferring Plaintiff to Kleberg County was an "adverse" act, but the words allegedly used by Sheriff Mills indicate that Sheriff Mills himself believed the transfer was to a facility that was less desirable than ACDC, and that the transfer was conducted *because* the Kleberg County facility was less desirable than ACDC.  Plaintiff's allegation plausibly claims that the transfer was adverse in a more than *de minimis* way, because he claims that he was placed in solitary confinement, drugged, passed out, and "woke up with a dildo in [his] anus."  (Doc. No. 44, p. 19.)

Because Plaintiff plausibly alleges the elements of retaliation by Sheriff Mills, but does not plausibly allege that this retaliatory act was taken by any other defendant, the district should RETAIN the retaliation claim against Sheriff Mills, but should dismiss the allegation to the extent Plaintiff levels it against any other defendant.  The undersigned will order service of process on Sheriff Mills on this claim.

### ii. *Indefinite solitary confinement.*

Plaintiff alleges that he was placed in "indefinite" solitary confinement starting around June 21, 2023.  (Doc. No. 46, p. 10 ¶¶ 34(b)(i-iii).)[8]  He alleges that Sheriff Mills, Chief Brooks,

---

[7] It is not entirely clear from Plaintiff's filings how Sheriff Mills knew about this lawsuit on July 16, 2023: the undersigned did not issue the screening memorandum in this case until August 21, 2023 – approximately three weeks after Plaintiff allegedly returned from the "retaliatory" transfer to Kleberg County – and no defendant had been served with this lawsuit.  But Plaintiff alleges that Sheriff Mills did know of the lawsuit, and describes in detail how the sheriff allegedly transferred Plaintiff to Kleberg County because of the suit.  The Court must take Plaintiff's nonconclusory factual allegations as true for purposes of screening, even if those factual allegations seem doubtful.

[8] The "indefinite" solitary confinement may have ended by July 16, when Plaintiff was allegedly transferred to Kleberg County.

Deputy Chief Chapa, and Lieutenant Martinez committed this act.  *Id.* ¶ 34(b)(ii).  Asked for his evidence that the person who committed the act specifically intended it as retaliation for filing grievances or this lawsuit, Plaintiff states, verbatim:

> Amando Chapa told me Im full of shit and have a propensity to fabricate truth and warp facts and he's in charge.  Just because I have a lawsuit doesn't mean I'm protected in title 18, that he can do this thing … its called … we don't give a fuck! because the County is prepared to defend and offer real evidence for your false accusations and blantant made up accusations.  He knows people in the County.

*Id.* ¶ 34(b)(iv).  Plaintiff does not offer any other evidence that any other defendant aside from Deputy Chief Chapa ordered Plaintiff into solitary confinement.

The district court should RETAIN this claim, but only against Deputy Chief Chapa.  The question is close, because Plaintiff does not clearly state that he was placed into solitary confinement because he had filed grievances or this lawsuit.  But Plaintiff's description of Deputy Chief Chapa's statement is sufficiently specific to indicate that Plaintiff's placement in solitary confinement would not have occurred were it not for Plaintiff's grievances or this lawsuit.  The undersigned will order service of process on Deputy Chief Chapa on this claim.

The district court should DISMISS this claim to the extent that Plaintiff alleges retaliation by any other defendant, because Plaintiff has not provided any plausible factual allegation that any other defendant ordered him into indefinite solitary confinement.

### *iii.  Threat level classification and uniform.*

Plaintiff claims that Chief Deputy Gutierrez, Deputy Chief Chapa, and Lieutenant Martinez set his classification at the highest threat level around December 20, 2022, and forced Plaintiff to wear a red uniform, because he filed this lawsuit.  (Doc. No. 46, p. 10 ¶¶ 34(b)(i-iii).) Asked for his evidence that the person who committed the act specifically intended it as retaliation for filing grievances or this lawsuit, Plaintiff states that he attended an "improper

31 / 37

discipline hearing where my charges were dismissed but Chapa stated I was classified this level because I attacked two of his guards August 23, 2022 and they had to administer chemical mace because I forced them in self defense.  Also this is my jail and we decide whats appropriate."  *Id.* ¶ 34(b)(iv).  He continues, verbatim:

> As other inmates are being shackled for court Chief Guttierrez tells Sgt Cooper he wants to see me in red at court everytime.  At the same time Chapa is speaking to Martinez and states he thinks he can sues us and expect nothing to happen.

*Id.*

The district court should DISMISS this allegation.  Plaintiff's own allegations reflect that he was not classified at the highest threat level because he filed grievances or this lawsuit – rather, Plaintiff states that his classification level was raised because he was alleged to have attacked two guards.  He therefore fails to plausibly allege the intent and causation elements of his retaliation claim.  With regard to the "red uniform" allegation, Plaintiff fails to plausibly allege how changing the color of his uniform is an adverse act.  Dismissal is appropriate.

### iv.  *Food tampering and poisoning.*

Plaintiff alleges that jail officials are tampering with or poisoning his food with "spit, feces, and [semen].  Also excessive salt and Raid."  (Doc. No. 46, p. 11 ¶ 34(b)(i).)  This treatment allegedly began in April 2023 and is continuing.  *Id.* ¶ 34(b)(iii).  He claims:

> I was told my food had spit at first and later it was confirmed human fecal matter (feces) and feet fungus.  I started to pay attention and ultimately stopped eatting the food altogether because a whole shift poisoned my food with seamen and the guard supposedly had Hepititus-C.  I heard the guards talking and laughing about it trying to figure out if I ate my food this comes after my dermintology visit in which deputy Chapa assures me that my food is not being tampered with and proven he was wrong.

(Doc. No. 44, p. 17) (verbatim).  Plaintiff also alleges that his food was "served ice cold and food portions becoming smaller or food groups similar" after filing grievances.  (Doc. No. 44, p. 15.)

Plaintiff alleges that the people who engaged in this treatment are "Sgt Lopez, Cpl Fincher, Rosemond, Pena, Barcus, Zarate, Alvarado (an entire shift), Cpl Vanmetter, Cpl Nguyen, Solis, Copeland, Arndt, Eisemann, Sgt Cooper (entire shift), Browning, Lt Martinez, Sgt Andrade, and Amando Chapa" and that these people were assisted by unnamed trustees (Doc. No. 46, p.11 ¶ 34(b)(ii); *id.* at 13 ¶ 36(b).)  Of these, Plaintiff has listed as defendants only Corporal Alvarado, Lieutenant Martinez, and Deputy Chief Chapa.  Asked for his evidence that the person who committed the act specifically intended it as retaliation for filing grievances or this lawsuit, Plaintiff states, verbatim:

> This one is complicated but I have written down multipul overheard conversations of guards talking amongst themselves and with Chapa or Lt Martinez.  Chapa knew this was happening and personally told people that he was going to ignore my grievances for them not to worry about anything.  Hes been talking to the sheriff, Chief Guttierez and the new chief that is replacing Gutterez (Micheal brooks), and Judge Diane Dupnik while the sheriff talks to the local district judges Whateley, Gaughor, and Flannigan.

*Id.* at ¶ 34(b)(iv).

The district court should DISMISS this allegation.  To the extent Plaintiff may have plausibly alleged that his food was tampered with at all, he does not offer any direct evidence of anyone's intent to retaliate against him for filing grievances or this lawsuit by tampering with Plaintiff's food.  Nor does he plausibly claim that the alleged tampering would not have occurred were it not for Plaintiff's filing of grievances or this lawsuit.  At most, he claims that he filed grievances or this lawsuit, and that at some point thereafter his food was tampered with.  But because he does not offer either direct evidence of retaliatory intent or a plausible timeline from which such intent could be inferred, Plaintiff fails to lodge a viable claim.  The district court should dismiss it.

### v. Changing bond amounts, or denying bond.

Plaintiff alleges that, around February 2023, his bonds were changed by Deputy Chief Chapa, Lieutenant Martinez, Sergeant Cooper, and Sergeant Andrade.  (Doc. No. 46, p. 11 ¶¶ 34(b)(i-iii).  Liberally construed, although his allegation is not particularly clear, Plaintiff appears to be claiming that jail officials are changing his bond amounts "without having to take [him] to court."  *Id.* at 11-12 ¶ 34(b)(iv).  He claims that "they are intercepting and not sending my legal mail.  If my mail is it's being ignored by the judges for administrative error.  Chapa, Chief, and the sheriff have the judges on board."  *Id.* at 12 ¶ 34(b)(iv).

The district court should DISMISS Plaintiff's bond claim.  Plaintiff offers no plausible explanation for how any of the defendants could have changed Plaintiff's bond amounts or denied bond to Plaintiff.  *See*, *e.g.*, Tex. Code Crim. Proc. art. 17.023 (only a magistrate, a justice of the peace, or a judge may release a defendant on bail); *id.* art. 17.028 (describing process for setting bail amounts).  Indeed, Plaintiff acknowledges that Lieutenant Martinez told him that only judges can change bond amounts.  (Doc. No. 46, p. 11 ¶ 34(b)(iii).)  Plaintiff also fails to plausibly allege that any change to any bond amount – if it occurred – was motivated by retaliatory intent by anyone, or that the bond amounts would not have been changed, or bond denied, had Plaintiff not filed grievances or this lawsuit.  Because Plaintiff fails to plausibly allege multiple elements of a viable retaliation claim, dismissal is appropriate.

### vi. Interception or viewing of legal mail.

Liberally construed, Plaintiff claims that, on an unspecified date, unnamed jail guards entered his cell and "illegally physically confiscated three title 42 that I was actively working on then proceed to read all my legal mail and paperwork relating to this suit to confiscate physical papers of me detailing my daily events, interactions, and handwritten copies of grievances

submitted as well as all request forms." (Doc. No. 46, p. 9 ¶ 34.) Plaintiff also alleges that Chief Deputy Chapa told Lieutenant Martinez, on or about December 20, 2022 (the day on which this Court received Plaintiff's original complaint in this case) "lets pay attention to his mail. This is now a problem because they are reading my legal mail gaining advantage." *Id.* at 11 ¶ 34(b)(iv).

The district court should DISMISS this allegation, such as it is. Plaintiff fails to plausibly describe how any confiscation of documents was intended as retaliation for the filing of grievances or this lawsuit, or that Plaintiff's documents would not have been confiscated were it not for his filing of grievances or this suit. Additionally, Plaintiff fails to plausibly allege an adverse retaliatory act, because he does not describe how the reading of any legal mail (if it has occurred at all) has harmed him. Plaintiff is not represented by counsel, so there are no attorney-client privileged communications involved in this case, and Plaintiff's filings with this Court are matters of public record that can be read by anyone. Plaintiff does not allege that his mail is not reaching the Court, or that he is not receiving mail that the Court is sending to him. Because Plaintiff fails to plausible allege any retaliatory act, the district court should DISMISS this liberally construed claim.

### E. Conclusion and recommendations.

To recap:

- The district court has already RETAINED Plaintiff's Fourteenth Amendment claims for excessive force and denial of medical care against Sergeant Maddox, Sergeant Dugger, Officer Arisola, and Corporal Urhea in their individual capacities.

- The district court should RETAIN Plaintiff's Fourteenth Amendment deliberate indifference claim against Deputy Chief Chapa in his individual capacity for confiscating or denying Plaintiff's medical passes.

- The district court should RETAIN Plaintiff's Fourteenth Amendment due process claim against Sheriff Mills and Deputy Chief Chapa in their individual capacities regarding his placement into disciplinary segregation from August 23 to 26, 2022.

- The district court should RETAIN Plaintiff's Fourteenth Amendment due process claim against Deputy Chief Chapa, Lieutenant Martinez, Sergeant Tober, and Corporal Alvarado in their individual capacities regarding the August 26, 2022 disciplinary hearing.

- The district court should RETAIN Plaintiff's retaliation claim against Sheriff Mills in his individual capacity for temporarily transferring Plaintiff to a detention facility in Kleberg County.

- The district court should RETAIN Plaintiff's retaliation claim against Deputy Chief Chapa in his individual capacity for ordering that Plaintiff be placed into indefinite solitary confinement on or about June 21, 2023.

- The district court should DISMISS with prejudice Plaintiff's remaining claims against all other defendants as frivolous or for failure to state a claim upon which relief can be granted, pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b)(1).

The undersigned will order service, by separate order, on Sheriff Mills, Deputy Chief Chapa, Lieutenant Martinez, Sergeant Tober, Corporal Alvarado, Sergeant Maddox, Sergeant Dugger, Officer Arisola, and Corporal Urhea with respect to the claims retained in this case.

### F. Notice.

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel. Within 14 days after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States magistrate

36 / 37

judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), and General Order No. 2002-13, United States District Court for the Southern District of Texas. A failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *See Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).

      SIGNED on July 17, 2024.

                               MITCHEL NEUROCK
                               United States Magistrate Judge